UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

David Leppek,

                Plaintiff,

v.

Ford Motor Company

                Defendant.

Case No. 18-13801

Paul D. Borman
United States District Judge

David R. Grand
United States Magistrate Judge

_____

**OPINION AND ORDER GRANTING DEFENDANT FORD MOTOR COMPANY'S MOTION FOR SUMMARY JUDGMENT (ECF No. 27)**

## I.    Introduction

Plaintiff David Leppek filed this action against Defendant Ford Motor Company on December 7, 2018. (ECF No. 1, Complaint.) Plaintiff alleges violations of the Americans with Disabilities Act as Amended, 42 U.S.C. 12101, et seq. ("ADA"). Specifically, Plaintiff alleges that Defendant failed to accommodate his disability, which stems from a seizure disorder Plaintiff has had since his teen years. (ECF No. 1 PageID. 3-4)

Before the Court is Defendant's Motion for Summary Judgment, filed on September 14, 2020 (ECF No. 27) Plaintiff filed a Response on October 26, 2020. (ECF No. 34.) Defendant filed a Reply on November 9, 2020. (ECF No. 40.)

On April 19, 2021, this Court held a Zoom video hearing on Defendant's Motion for Summary Judgment.

## II.    Facts

Plaintiff David Leppek began working for Defendant Ford Motor Company in October 1999. (ECF No. 1 PageID.2 ¶ 6; Deposition of David Leppek ("Leppek Dep."), 112:7-12, ECF No. 34-1 PageID.1602.) Leppek has worked at various Ford plants over the years. (Leppek Dep. 112:7-12, ECF No. 34-1.)

Plaintiff has had a seizure disorder—medically refractory localization-related epilepsy—since his teen years. (ECF No. 1 ¶ 8-9.) This disorder cannot be controlled by medication. (Leppek Dep. 315:24-316:1, ECF No. 27-2; Deposition of Plaintiff's Neurologist Dr. David Burdette ("Burdette Dep") 9:22-10:8, 64:3-65:4, ECF No. 27-3.) Plaintiff has taken several leaves of absence from employment with Ford while receiving treatment for his seizure disorder, among other medical issues. (ECF No. 1 ¶ 12). Plaintiff has actively worked approximately 10 of the 21 years since he was hired. (Leppek Dep. 112:7-116:4, ECF No. 27-2.)

Plaintiff Leppek most recently returned from a leave of absence dating from December 3, 2014 through April 2017 during which plaintiff "received treatment for his seizure disorder and a broken leg," (ECF No. 1, ¶ 14) and was implanted with a Vagus Nerve Stimulator ("VNS"), which was intended to help alleviate seizures. (Leppek Dep. 166:19-22, ECF No. 27-2; Burdette Dep. 51:4-6, 65:1-4, 93:16-95:15, ECF No. 27-3.)

On March 31, 2017, shortly before returning to work, Plaintiffs neurologist, Dr. David Burdette, cleared Plaintiff to return to assembly line work, so long as standard safety devices were in place and that Plaintiff be restricted from unprotected heights. (Burdette Dep. 128:1- 29:15, ECF No. 27-3; Ex. 7 to Burdette Dep., ECF No. 27-3 PageID.810).

From February until June 14, 2017, Plaintiff worked on the assembly line. On that date, Plaintiff had a seizure at work in front of a coworker, who helped Leppek to the ground and held his head during the seizure (ECF No 27-8 PageID.1126), after which security transported Leppek to plant medical via a plant ambulance. (ECF No. 27-8 PageID.1128-29.) Leppek was prevented from returning to work until he received clearance from Dr. Burdette. (*Id.*) Dr. Burdette assessed the Plaintiff two days later and allowed him to return to work with the only restriction being no driving. (Burdette Dep. Ex. 9 ECF No. 27-3 PageID.812-814.) Ford's Sterling Plant physician, Dr. Arthelia Brewer, reached out to Dr. Burdette with concerns about the lack of restrictions. (ECF No. 27-6 PageID.1070.) Plaintiff returned to work on June 28, 2017 in the same position with restrictions of no driving, no work at unprotected heights, no work around open flames or large bodies of water, and as long as standard safety devices on assembly line were functioning properly. (Leppek Dep. 189:9-16, ECF No. 27-2; ECF No. 27-8 PageID.1128-29.)

In August 2017, Plaintiff reported to Plant medical that he had had two seizures at work. (Leppek Dep. 193:19-196:17 & Exs. 17-18, ECF No.27-2 PageID. 359, 528-31.) Plaintiff's neurologist Dr. Burdette released him to return to work as of August 31, 2017 without information about restrictions. (ECF No. 27-3 PageID.815-816.) Dr. Burdette's office notes from August 22, 2017, during the period that Plaintiff was on medical leave, state that Plaintiff had called and told them that "he has had about 7 seizures since Friday." (ECF No. 28-3, PageID.1342.) Plaintiff returned to work on September 5, 2017 with restrictions of no driving, no work at unprotected heights, and as long as standard safety devices on assembly line were functioning properly. (ECF No. 27-6 PageID.1074-75.)

On September 21, 2017, Plaintiff had a seizure at work in front of a co-worker, who bought him to Plant medical. (ECF No. 27-2 PageID.532.) Dr. Burdette's office notes from that date stated that that Leppek called and has had seizures "daily for the past 3 weeks." (ECF No. 28-3, PageID.1355.)

The day following Leppek's on-the-job seizure, September 22, 2017, Dr. Burdette released Plaintiff to return to work, with no information on restrictions. (ECF No. 27-2 PageID.537.) In response to Dr. Burdette's release, the Sterling plant physician, Dr. Brewer, conferred with Dr. Burdette and expressed her concerns about the Plaintiff being returned to work without additional restrictions. (ECF No. 27-2 PageID.534-35, 539.) On October 6, 2017, Dr. Burdette ultimately agreed with

Dr. Brewer that Plaintiff required additional restrictions of no work with heavy or high voltage equipment and no work around moving machinery. (ECF No. 27-2 PageID.539; PageID.534-5.) These restrictions required reassignment from Leppek's then-current position as a job setter which involved work on a moving line and with high voltage machinery. (Declaration of Ford Supervisor of Labor Relations Yvette Clay, ECF No. 50, ¶ 10, citing Employee History Records, ECF No. 50-2.) Dr. Brewer's records from October 5, 2017 state that "[g]iven the uncontrolled seizure activity within the past month, this employee should not be permitted to work as a jobsetter at this time as he poses an imminent risk to himself and/or others." (ECF No. 27-6 PageID.1096.)

On October 30, 2017, Plaintiff was assigned to a new temporary medical based position in Department 61. (ECF No. 1 ¶ 22; Leppek Dep. 204:16-205:12, ECF No. 27-2 PageID.370; Brewer Dep. 92:8-101:23, ECF No. 27-6.) Department 61 is located in a warehouse/loading dock adjacent to the main building and assembly floor. Dr. Brewer reviewed and approved the proposed job in Department 61, with some reservations, "because there are some portions of that job that did not completely meet the [Oct. 6th] restrictions as specified." (Brewer Dep. 93:5-15, ECF No. 27-6.)

On November 16, 2017 Plaintiff claims that, while working in Department 61, as he was walking through the main plant to speak with someone in Human Resources,

> "[Leppek] stopped to check his phone and heard a loud 'bang' from a piece of machinery. He looked up and saw a large automated guide vehicle coming toward him. These are extremely large multi-ton pieces of equipment. He started quickly moving away from the vehicle to get away from it. In his hurry, he tripped over the tongue of the tug the vehicle was pulling through the plant." (ECF No. 1 ¶ 24)

Plaintiff claims he did not have a seizure on this date, and notes that witnesses to the incident saw "nothing noticeable" or unusual about Plaintiff's behavior, in addition to records showing that Dr. Brewer observed a head injury but found no evidence of a seizure. (Unusual Behavior Observation Checklist for Supervisors, ECF No. 34-5; ECF No. 34-15, PageID.1911). After the incident, security personnel took Plaintiff to the clinic, and Dr. Brewer noted that "[c]oncerns exist relative to safety of employee and coworkers," and that per corporate medical, Plaintiff was "unable to classify" and did not approve his return to work. (ECF No. 34-15, PageID.1911) Dr. Brewer's records from her assessment of Leppek on November 28, 2017 suggests that an observer "described possible post-ictal sequalae [post-seizure symptoms]." (ECF No. 34-16 PageID.1914).

Defendant Ford describes the same incident differently. Defendant claims that on November 16, 2017, Plaintiff left a pedestrian walkway in the main plant, entered

a restricted area, and approached the automated guided vehicle ("AGV"). (ECF No. 27 PageID.146) Plaintiff then "inexplicably picked up a laptop from the back of the AGV and began randomly striking keys." (*Id*.) Defendant argues that Plaintiff had a seizure, and was in an altered mental state" during the incident. (ECF No. 27 PageID.139.) Without a bystander activating the emergency stop mechanism, Leppek could have been "crushed to death." Dr. Burdette testified in his deposition that the behavior suggested that Leppek likely had a seizure (Burdette Dep. 154:19-59:3, 160:7-161:6, ECF No. 27-3.) At Dr. Brewer's suggestion, Ford hired Dr. Brian Kirschner to conduct an IME. That IME suggested that "the [AGV incident] was likely a complex partial seizure." (ECF No. 34-8 PageID.1882.)

Following this incident, Dr. Brewer placed Leppek on paid leave, and alerted Dr. Burdette about the incident, writing on November 17, 2017 that Plaintiff was a safety risk the plant was unwilling to sustain. (ECF No. 27-6 PageID.1085.) Dr. Burdette's office notes from November 16, 2017 state that Leppek had called and ordered them to not speak with Ford or the Ford physician. (ECF No. 28-3 PageID.1365.)

On November 22, 2017, Dr. Burdette submitted a nearly identical copy of his March 31, 2017 return-to-work letter, which did not reference the November 16, 2017 incident or the other seizures that had occurred at work since that time. (*compare* November 22, 2017 Letter - ECF No. 27-3 PageID.825 *with* March 31,

2017 Letter – ECF No. 27-3 PageID.810.) Dr. Burdette indicated Plaintiff could return to work given the same prior restrictions. Dr. Brewer was concerned by Dr. Burdette's response and disagreed with his assessment.

Pursuant to the Ford-UAW collective bargaining agreement, given the dispute between the Plant physician and an hourly employee's personal physician, Plaintiff was required to be sent for an Independent Medical Exam ("IME"). Ford must then follow the recommendation of the IME. The independent medical examiner, Dr. Brian Kirschner, performed a review of Leppek's medical records and evaluated Leppek in person on December 4, 2017.

Dr. Kirschner issued permanent restrictions that included no operating power machinery or motor vehicles, no access to workplace areas potentially hazardous to himself or coworkers should he experience a spell of altered awareness or altered behavior, no walking in any restricted or potentially hazardous areas, and no entry of any potentially hazardous areas of the industrial facility. (Kirschner IME Report, ECF No. 28, PageID.1304-05.)[1]

---

[1] The Court notes pertinent portions of the December 4, 2017 IME Dr. Brian Kirschner's Report to Defendant Ford (ECF No. 34-8 PageID.1878-83):
SOCIAL HISTORY
…
He used to perform assembly and machinery work. Following a seizure at work in October 2017, he began performing warehouse work. Only on direct questioning does he admit to an episode last month during which he was nearly struck by an automated vehicle. He has been off work since that incident.
…
RECORD REVIEW

Dr. Brewer wrote Dr. Burdette seeking concurrence on the IME opinion and the new restriction. Dr. Burdette responded on December 22, 2017 that he believed the restrictions should only remain in place "until 6 months seizure free," but otherwise agreed with the restrictions. (ECF No. 27-2 PageID.547; Burdette Dep. 165:10-169:15, ECF No. 27-3.)

---

…
On November 22, 2017, Dr. Burdette wrote a note indicating restrictions identical to those he wrote on March 31, 2017. It appears that Dr. Burdette copied this note verbatim without review of the serious incident that had occurred on November 16, 2017.
…
A Department 61 Service packaging Job Description indicates that the employee needs to walk through the plant to get the job including walking near manufacture areas and areas with high-lo traffic, he has to use a hoist to transfer parts from a rack to cardboard blocks on a pallet, he has to use banding to secure the parts, he has to shrink-wrap the pallet while it spins on a rotating table, and he has to be aware of frequent hi-lo traffic.

CONCLUSIONS
…
He has increasing frequency of simple partial seizures in recent months, and the episode on November 16, 2017, was likely a complex partial seizure.
…

1. Is Mr. Leppek currently able to work with or without restrictions?
   Mr. Leppek can work with restrictions

2. If able to work, what restrictions would you specifically recommend in a manufacturing environment?
   Mr. Leppek can work in an environment in which he does not operate power machinery or motor vehicles, does not climb unprotected heights, and does not have access to workplace areas that are potentially hazardous to himself or to coworkers should he experience a spell of altered awareness or altered behavior.
   He should be prohibited from walking in any areas not identified as unrestricted. Reasonable accommodations should be made so that he does not need to go in any potentially hazardous areas of the industrial facility.

3. Are these restrictions permanent or temporary?
   Given Mr. Leppek's long history of medically-refractory epilepsy despite heroic attempts to control of his condition with surgical procedures, numerous anticonvulsants medications, and implanted stimulating devices, these restrictions are permanent.

On December 11, 2017 supervisors Jeff Nielson and Steve Orr at the Ford Sterling Plant completed a form indicating that they "Can Not Place" Leppek in any position given the restrictions instituted by the IME. (ECF No. 34-10)

Plaintiff submitted a formal request for accommodations to Labor Relations at Ford on December 15, 2017. (ECF No. 34-11.) Specifically, Plaintiff requested the following accommodations:

> (1) returning to his home plant of Romeo engine plant where he would have seniority; (2) Access the Northeast turnstile located in the Northeast corner of the Southeast parking lot to allow access to walk around the exterior of the main facility to his assigned work area without entering the main facility; (3) an escort, provided by Defendant or UAW, to walk Plaintiff through the main manufacturing facility if needed; (4) allow Plaintiff access through any other outside vehicle gate providing access to park or get dropped off outside his designated work area; and (5) only be given supervised access to main manufacturing facility for work related matters, supervised by whomever Defendant deems appropriate.

A December 20, 2017 letter from Terri Mayne (Labor Relations at Ford) to Leppek, in response to his accommodation request, stated that the recent restrictions instituted after the IME of "No work or access to potentially hazardous areas of the plant" make Ford unable to return Leppek to work, as his work area has access to hazardous areas of the plant. (ECF No. 27-10 PageID.1250). Mayne testified that Department 61, and all areas of the Plant, had access to hazardous areas. (Mayne

Dep. 41:25-45:23, ECF No. 27-10.) The letter instructed Plaintiff to fill out additional forms to properly make his accommodation request. (ECF No. 27-10 PageID.1250.)

Plaintiff describes that after he submitted the forms requesting accommodation, he met with Terri Mayne to discuss his request two months later in March 2017. (ECF No. 34 PageID.1567.) Plaintiff's proposed accommodations were discussed at the meeting. (Terri Mayne Notes, ECF No. 34-13, PageID.1901) Mayne reports that she recorded Plaintiff's requests and sent them to "corporate." (Mayne Dep. 72:4-18, ECF No. 27-10 PageID.1225.) After that, Plaintiff reports that he heard nothing. (ECF No. 34 PageID.1567-68.) Plaintiff says Ford has never sent him a denial of this request for further accommodation (in addition to his placement in Department 61 prior to the November 16, 2017 AGV incident), nor any information regarding the reasonableness of his requests. (*Id*. at PageID.1555.) He has been placed on "no work available" since the November 2017 AGV incident.

## III.    Standard of Review

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense

asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

## IV. Analysis

To establish an ADA violation, a plaintiff must show that (1) he is disabled, (2) he is otherwise qualified to perform the essential functions of the position, with or without accommodation, and (3) he suffered an adverse employment action because of his disability. *Ferrari v. Ford*, 826 F.3d 885, 891 (6th Cir. 2016).

Defendant Ford does not contest that Plaintiff Leppek is disabled within the meaning of the ADA, nor does it dispute that it knew he was epileptic and that he requested accommodations. Defendant argues that Plaintiff cannot establish the second element – that "he is otherwise qualified to perform the essential functions of the position, with or without accommodation." "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Plaintiff bears the initial burden of establishing that the accommodation he sought was "objectively reasonable." Reasonable accommodation may include "job restructuring" or "reassignment to a vacant position." 29 C.F.R. § 1630.2(o)(2)(ii).

The ADA does not require employers to create a new position for a disabled employee who can no longer perform the essential functions of his job. *Smith v. Ameritech*, 129 F.3d 857, 867 (6th Cir. 1997). An employer need not reassign a disabled employee to a position for which he is not qualified, nor is the employer required to waive legitimate, non-discriminatory employment policies or displace other employees' rights in order to accommodate a disabled employee. *Burns v. Coca-Cola Enterprises Inc.*, 222 F.3d 247, 257 (6th Cir. 2000).

It is a plaintiff's burden to show that a vacant position existed, and only when he meets that burden does the issue arise as to whether the failure to provide accommodation was due to a breakdown in the interactive process. *Kleiber v. Honda of Am. Mfg., Inc.,* 420 F. Supp. 2d 809, 826 (S.D. Ohio 2006), aff'd, 485 F.3d 862 (6th Cir. 2007).

### a. Was Leppek's Placement in Department 61 an Accommodation under the ADA?

Ford argues that Leppek's job in Department 61 was initially "created as a gratuitous accommodation, that Ford was not, and is not, required to provide him in the first place." (Motion for Summary Judgment, ECF No. 27 PageID.153.) Leppek, on the other hand, argues that there is no evidence that he was placed in Department 61 as an accommodation nor evidence that it was a temporary position. (Plaintiff's Response, ECF No. 34 PageID.1557.)

A "Reasonable accommodation" may include "reassignment to a vacant position." 29 C.F.R. § 1630.2(o)(2)(ii). In the accommodation process, the employee is not required to use magic words such as "accommodation" and "disability" *Leeds v. Potter*, 249 F. App'x 442, 449 (6th Cir. 2007) rather, a court asks whether "a factfinder could infer that [the interaction] constituted a request for an accommodation ... ." *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004).

The Court finds that Leppek's placement in Department 61 was indeed an accommodation under the ADA. Although Defendant did not reassign Leppek to Department 61 in response to a formal accommodation request, the chain of events indicate that Leppek's reassignment was a direct result of Ford's attempts to find suitable work for Leppek given his medical needs and restrictions.

Restrictions put in place after Leppek suffered a seizure on the job on September 21, 2017 required reassignment from Leppek's then-current position as a job setter in the main assembly plant. Following this on-the-job seizure, Leppek's neurologist, Dr. Burdette, released Leppek to return to work without additional restrictions. (ECF No. 27-3 PageID.816.) Ford's Dr. Brewer then reached out to Dr. Burdette with concerns about the lack of additional restrictions. Dr. Burdette agreed with new restrictions of no work with heavy or high voltage machinery. (ECF No. 27-2 PageID.534-35; ECF No. 27-3 PageID.818.)

Dr. Brewer's subsequent records from October 5, 2017 state that "[g]iven the uncontrolled seizure activity within the past month, this employee should not be permitted to work as a jobsetter at this time as he poses an imminent risk to himself and/or others." (ECF No. 27-6 PageID.1096.) Notes from Dr. Brewer's examination of Leppek after the AGV incident describing Leppek's changing restrictions stated that "he was placed in the storage area [Department 61] to accommodate these restrictions." (ECF No. 34-16 PageID.1914.)

Dr. Brewer assessed the Department 61 warehouse job before his assignment and decided that Leppek's October 6, 2017 restrictions could be accommodated in Department 61, but that she made the determination "[w]ith some reluctance." Dr. Brewer agreed to allow Leppek to "try" the position, but with subsequent review, "because there are some portions of that job that did not completely meet the restrictions as specified." (Brewer Dep. 93:5-15, ECF No. 34-3.) Dr. Brewer's records also indicate that union representatives were involved during this accommodation process. (ECF No. 27-6 PageID.1078-79.) Further, according to Ford's Supervisor of Labor Relations Yvette Clay: "The Plant's records reflect that Mr. Leppek was placed in Department 61 as a medical placement after his medical condition precluded him from working jobs within his Machining Associate classification." (Declaration of Yvette Clay, ECF No. 50, ¶ 10, citing Employee

History Records, ECF No. 50-2.) These facts all describe an informal accommodation process leading to Leppek's reassignment to Department 61.

In response, Leppek points to Ford employee Terri Mayne's deposition where she stated that she had never been involved in an accommodation process before Leppek's formal request after the AGV incident. But there is clear evidence that Ford's creation of a new temporary position and placement in Department 61 was in response to new medical restrictions that required Leppek's reassignment.

### b. Was Leppek's Assignment to Department 61 a Temporary Placement or Permanent Position?

Plaintiff bears the burden of showing that a vacant position exists and that the Plaintiff is qualified for that position. *Kleiber,* 420 F. Supp. 2d at 821 aff'd, 485 F.3d 862 (6th Cir. 2007). In *Smith v. Ameritech*, 129 F.3d 857, 866-67 (6th Cir. 1997), the Sixth Circuit Court of Appeals held:

> Our inquiry, therefore, is limited to whether plaintiff was "otherwise qualified" for his position, and whether he was denied reasonable accommodations … the ADA does not require employers to create a new position for a disabled employee who can no longer perform the essential functions of his job … Similarly, the ADA does not require an employer to reassign an employee to a position that is not vacant. (866-67)

The Sixth Circuit has recognized a distinction between temporary positions and permanent, vacant positions.

In *Clark v. Central Cartage Co.*, where the "evidence indicate[d] that the [defendant-employer] treated [the plaintiff] as an employee on temporary

assignment," rather than "as an employee in a permanent position," the Sixth Circuit Court of Appeals found that the plaintiff failed to create a genuine issue of material fact regarding whether his "job in question" was the job he was working when he was terminated, instead of the job he was hired for. 73 F.3d 361 n.2 (6th Cir. 1995).

In *Wardia v. Justice & Pub. Safety Cabinet Dep't of Juvenile Justice*, even where the plaintiff presented proof that he was permitted to "work in the control room without incident for over a year" and "submitted an affidavit from a coworker" who was allegedly "offered a permanent position in the control room," the Sixth Circuit refused to find that the plaintiff's temporary time in the control room or the alleged job offer created a permanent control-room-operator position. 509 F. App'x 527, 532 (6th Cir. 2013). To the contrary, the court held that neither temporary, light-duty accommodations nor "isolated, unaccepted job offer[s]" created "a new position or change[d] the status of similar positions." *Id*; *See also Lai Ming Chui v. Donahoe,* 580 F. App'x 430, 435–36 (6th Cir. 2014) (plaintiff "has not identified a vacant funded position covering the activities she performed during her rehabilitation assignment.")

While this Court's finding that Plaintiff Leppek's initial placement in Department 61 was an accommodation, this does not necessarily lead to the finding that it was a vacant position. Indeed, Ford has produced significant evidence to support the conclusion that Ford was creating a temporary medical placement.

18

Leppek's employment records list his placement in Department 61 as "TEMPMEDPLACEMENT-RISTRIC." (ECF No. 50-2.) Yvette Clay, Supervisor of Labor Relations stated in her declaration: "Mr. Leppek's placement was not necessary for Department 61 to operate." (ECF No. 50, Clay Dec'l., ¶ 10.) The number of employees required to operate Department 61 is two hourly employees, "and two employees have held the Department 61 positions since August 2000." (*Id*., ¶ 8.) The other two employees in Department 61 hold the job classification of "Material Handler Associate" and have duties that include driving hi-los, which Leppek could not do given his restrictions. (*Id*.) During his employment, Leppek held the job classification of "Machining Associate." The job duties assigned to Leppek (packaging and shrink-wrapping) were part of the other Department 61 employees' job responsibilities. (*Id*. ¶ 9.) Clay also noted in her declaration that the other two Department 61 employees have seniority over Leppek under the collective bargaining agreement and Leppek has no right to displace either of those employees. (*Id*. ¶ 10.) Starting in Department 61 in late October 2017, Leppek only worked in that position for a short time before the AGV incident on November 17, 2017.

Plaintiff Leppek argues that if the job in Department 61 was merely a temporary position, then there is no reason that Ford should have issued him the requisite documentation for accommodations with the position description for Department 61. (Response, ECF No. 34 PageID.1558.) The Court finds that Ford's

on-the-ground efforts to try to accommodate Leppek after his AGV incident does not undermine the evidence that Leppek's placement in Department 61 was not intended to be permanent. Indeed, there was no evidence there was a vacant funded position to which he could return. The evidence shows that Ford initially created the temporary position and modified the regular duties in Department 61 in order to accommodate Leppek's restrictions instituted before the AGV incident and Dr. Kirscher's IME.

In *Smith v. Ameritech*, the plaintiff argued that because the Defendant employer provided an accommodation (to work from home) to another disabled employee, this was evidence that plaintiff was denied reasonable accommodation when the employer denied his request for the same accommodation. 129 F.3d at 867. The Sixth Circuit rejected this argument, reasoning that "[a]n employer who provides an accommodation that is not required by the ADA to one employee is not consequentially obligated to provide the same accommodation to other disabled employees." *Id.* (citations omitted). To hold otherwise, the court determined, "would effectively ratchet up liability" under the ADA and would "deter employers from providing greater accommodations that are required by law." *Id*. at 867-68 citing *Myers v. Hose*, 50 F.3d 278, 284 (4th Cir. 1995). By requesting an accommodation that the employer had previously provided, but was not required by the ADA, the plaintiff in *Smith* failed to propose an objectively reasonable accommodation for his

disability, and the court concluded that the plaintiff failed to create a genuine issue regarding whether he was an "otherwise qualified" individual. *Id*; *See also Lucas v. W.W. Grainger, Inc*., 257 F.3d 1249, 1257 (11th Cir. 2001) ("Good deeds ought not be punished, and an employer who goes beyond the demands of the law to help a disabled employee incurs no legal obligation to continue doing so.") Although the plaintiff in *Smith* was requesting an accommodation that was provided to a different employee, rather than the situation in this case, where Leppek is requesting accommodation that was previously provided to him, similar reasoning applies in this case.

Ford placed Leppek in Department 61 as an initial accommodation following his on-the-job seizure in September 2017. By creating the position in Department 61, which "did not completely meet the [Oct. 6, 2017] restrictions as specified" (Brewer Dep. 93:5-15, ECF No. 34-3.), and was not required for Department 61 to operate (ECF No. 50, Clay Dec'l. ¶¶ 8, 10), Ford went beyond what is required by the ADA. To require that Ford provide this accommodation in perpetuity would "effectively ratchet up liability" under the ADA. *Smith*, 129 F.3d at 867-68.

### c. Leppek's Proposed Accommodations

Plaintiff Leppek requested additional accommodations involving his return to the created position in Department 61. Plaintiff's proposed accommodations would allow him to get to and from a job in Department 61, either by walking around the

building, getting dropped off at Department 61 in a car, or having an escort when he needed to enter the main building. (ECF No. 34-11.)

Based on the evidence before this Court, no reasonable juror could determine that Leppek has satisfied his burden of identifying a vacant position within his restrictions in which he could be placed. Because Plaintiff only argues for proposed accommodations that involve his return to the temporary medical position that Ford was not required by the ADA to create in the first place, no reasonable juror could find that he has proposed a reasonable accommodation that would allow him to return to work. Thus, Plaintiff has not shown that he is an "otherwise qualified individual" as required to state a case of discrimination under the ADA. Ford is entitled to Summary Judgment.

### d. Direct Threat

Even if this Court were to determine that Leppek has proposed a reasonable accommodation involving a return to Department 61, Ford has shown that it reasonably determined that Leppek was a "direct threat to the health or safety of other individuals in the workplace," and is entitled to summary judgment on those grounds. 42 U.S.C. § 12113(b).

A disabled person is not qualified for an employment position "if he or she poses a 'direct threat' to the health or safety of others which cannot be eliminated by a reasonable accommodation." *Michael v. City of Troy Police Dep't*, 808 F.3d 304,

307 (6th Cir. 2015) (citations omitted). "Courts are to assess the objective reasonableness of the views of the employer and/or employer's medical professionals who made the direct threat-decision." *Wurzel v. Whirlpool Corp*., 482 F. App'x 1, 12 (6th Cir. 2012) citing *Bragdon v. Abbott,* 524 U.S. 624, 650, 118 S. Ct. 2196, 2210 (1998).

The Code of Federal Regulations further provides in Title 29, Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act, at section 1630.2(r) (Definitions):

> (r) Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a "direct threat" shall be based on an individual assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:
> (1) The duration of the risk;
> (2) The nature and severity of the potential harm;
> (3) The likelihood that the potential harm will occur; and
> (4) The imminence of the potential harm.

An employer may rely on both objectively reasonable medical opinions and objective testimonial evidence to satisfy the "direct threat" showing. *Michael v. City*

*of Troy*, 808 F.3d at 307. Ford relied on both types of evidence in making its determination that Leppek could not be safely returned to work.

Ford relied on an objectively reasonable medical opinion, the IME of Dr. Kirschner and the statements of its employees who witnessed the Plaintiff's seizures.[2] Although the IME did not conclude that Leppek could not be returned to work in Department 61, Dr. Kirschner added permanent restrictions of no work in, or access to, hazardous areas. These restrictions were agreed with in substance by Ford's Dr. Brewer, and Leppek's own neurologist Dr. Burdette, although he believed the restrictions should be in place only until Leppek was seizure-free for six months. Ford contends that, given the November 16, 2017 incident on the Plant floor, which

---

[2] Exhibit ECF No. 27-8 contains statements of Ford employees who interacted with Plaintiff during significant incidents.

Incident Report dated June 14, 2017: Janae Drummonds stated, "I heard parts hit the ground, turned around and he was grabbing onto the line starting to fall. I got to him before he fell and eased him to the ground. I held his head up till he stopped having a seizure." There were no injuries reported. (*Id*. at PageID.1126.)

Incident Report dated November 16, 2017: "Gary [Wilson] explained that Mr. Leppek had approached a nearby machine (AGV) and began interacting with the computer on the back of it when he had no reason to do so. … David Leppek was questioned about what he was doing and told Maxine Anderson he didn't even remember touching the computer." (*Id*. at 1131.)

Jonathan Faski: "As I was testing the AGV route …. When I turned around, there was someone I didn't recognize standing at my computer which was resting on the back of the AGV. I hollered to get the man's attention and that's when he to walked backward behind the AGV … and tripped over the tongue of the trailer. Then I ran up to the AGV and pressed the emergency stop to halt the vehicle." (*Id*. at 1132.)

Chis Mayberry: "I witnessed the individual approach the moving AGV and touch items on it. I said to him to leave it alone. Then he took the laptop backpack and tripped over the hitch. The Ford employee hit the emergency stop to halt the AGV." (*Id*. at 1133.)

occurred while Leppek was working in Department 61, that location clearly had access to hazardous areas for Plaintiff.

An employer may, in certain circumstances, rely on the results of a medical examination to determine that a person cannot perform the essential functions of a position for purposes of the ADA. *Wurzel*., 482 F. App'x at 15; *Roring v. Ford Motor Co*., No. 15-13514, 2017 WL 605288, at *6 (E.D. Mich. Feb. 15, 2017) ("an employer is permitted to rely on the results of a medical examination so long as it is an "individualized inquiry" based on the employee's actual medical condition" citing *Ferrari v. Ford Motor Co.*, 96 F. Supp. 3d 668, 676 (E.D. Mich. 2015).) The ADA "mandates an individualized inquiry in determining whether an employee's disability or other condition disqualifies him from a particular position." *Holiday v. City of Chattanooga,* 206 F.3d 637, 643 (6th Cir. 2000). An individualized inquiry is one that focuses on "the individual's actual medical condition, and the impact, if any, the condition might have on that individual's ability to perform the job in question." *Id.* In *Michael v. City of Troy,* 808 F.3d 309, the court stated that:

> Reasonable doctors of course can disagree—as they disagree here—as to whether a particular employee can safely perform the functions of his job. That is why the law requires only that the employer rely on an "objectively reasonable" opinion, rather than an opinion that is correct.

Dr. Kirschner performed an in-person IME of Leppek, reviewed his medical records, and reviewed his job duties in Department 61. (Kirschner IME Report, ECF

No. 28, PageID.1304-05.) The IME did not conclude that the plaintiff could not safely perform the job in question, but the IME stated that Leppek could return to work with restrictions and that "reasonable accommodations should be made so that he does not need to go in any potentially hazardous areas of the industrial facility." (ECF No. 34-8 PageID.1883.) Although Kirscher's IME did not state specifically that Leppek could not be returned to work or that he posed a direct threat, Ford in part relied on that medical opinion, the restrictions instituted therein, and Leppek's coworkers' reports of his incidents, in reasonably determining that Leppek could not safely be returned to work in Department 61 or elsewhere in the Plant because all areas had direct access to potentially hazardous areas. Given the restrictions instituted by the IME, Ford supervisors Jeff Nielson and Steve Orr at the Sterling plant completed a form indicating that they "Can Not Place" Leppek in any position. (ECF No. 34-10.)

The conclusion that Leppek could not be safely returned to work anywhere in the Plant because of the restriction of no access to hazardous areas, based on the restrictions in the IME, is bolstered by the testimonial and documentary evidence of Leppek's history of increasing serious seizures in the workplace. Over the previous several months, Leppek experienced at least four reported seizures at work which required additional restrictions and required his transfer to Department 61. After only a short time in that position, Leppek had the incident involving the AGV where

he left a clearly marked pedestrian walkway, entered a restricted area, and approached an AGV, which he admittedly had no business doing, fell, and another employee saved his life by rushing over to stop the AGV.

There is compelling evidence that Leppek was in an altered state during the November 16, 2017 incident and did have a seizure. The medical opinions available to Ford (Dr. Brewer's records and Dr. Kirschner's IME) do suggest the AGV incident was a result of a seizure, and Ford was reasonable in relying on these medical opinions and the statements of its employees who viewed the incident, as seizure-related.

This Court also notes significant evidence of Leppek's concealment of his seizure activity from Ford and Dr. Kirschner. While Leppek did report several seizures to Ford, Dr. Burdette's office notes suggest that Leppek's seizure activity was more significant than Leppek represented to Ford. (*See e.g.* ECF No. 28-3, PageID.1342 (August 22, 2017 Dr. Burdette office notes state that Plaintiff had called and told them that "he has had about 7 seizures since Friday."); ECF No. 28-3, PageID.1355 (September 21, 2017 (date of seizure at work) Dr. Burdette office notes also that Leppek told Burdette's office that he had seizures "daily for the past 3 weeks.")).

Notably, on the date of the AGV incident, Leppek called Dr. Burdette's office and ordered them to not speak with Ford. (ECF No. 28-3 PageID.1365.) It does not

appear that Dr. Kirschner had access to these particular medical records, or that Leppek revealed the full extent of his recent seizure activity to Dr. Kirschner. Leppek's suggestion that if he had a seizure which caused the AGV incident "he would have immediately reported it" to Ford is not consistent with the record evidence in this case. (Response, ECF No. 34 PageID.1571.)

The Sixth Circuit Court of Appeals in *Wurzel* looked to cases from outside the Circuit where courts of appeal have affirmed summary judgment in favor of a defendant employer where the record evidence demonstrated that the plaintiff was a direct threat in his factory workplace despite limited at-work incidents:

> In *Moses v. American Nonwovens, Inc.,* 97 F.3d 446, 447–48 (11th Cir.1996), *cert. denied,* 519 U.S. 1118, 117 S.Ct. 964, 136 L.Ed.2d 849 (1997), the Eleventh Circuit explained that an epileptic worker with a significant risk of seizures on the job who worked close to fast-moving and high-temperature machinery was a direct threat. The court rejected the worker's argument that there was no actual risk of harm as long as he followed instructions and worked "downstream" from the equipment. *Id.* at 448. In *Hutton v. Elf Atochem North America, Inc.,* 273 F.3d 884, 886–87 (9th Cir.2001), the plaintiff, a diabetic who had experienced hypoglycemic episodes where he could not communicate for a period of time and was sometimes lightheaded, operated the equipment that produced, stored, and transferred liquid chlorine. The court acknowledged the plaintiff's arguments that he lost consciousness only once in his lengthy tenure and that the potential for harm was small because of the safety features of the equipment he used. *Id.* at 893–94. However, the court concluded that the plaintiff nevertheless posed a significant risk under the direct-threat framework, noting the plaintiff's history and the fact that "a significant physical or mental lapse by

> [plaintiff] as a result of a diabetic episode could result in substantial harm to his co-workers and others." *Id.* at 894. Finally, in *Darnell v. Thermafiber, Inc.,* 417 F.3d 657, 661 (7th Cir.2005), the Seventh Circuit concluded that a plaintiff with uncontrolled diabetes and a resulting risk of passing out on the job presented a direct threat where employees were required to climb tall ladders, operate dangerous machinery, and help lift 80–pound pieces of fiberboard in a hot environment. The court reached this conclusion despite plaintiff's arguments that the single doctor who evaluated him was not thorough enough and that he had worked at the plant for ten months without incident. *Id.* at 660, 662.

*Wurzel*, 482 F. App'x 1, 12-13 (6th Cir. 2012).

While the parties dispute the level of hi-lo or other hazardous activity within Department 61 itself, the evidence clearly shows that there was at least some hi-lo traffic in the Department 61 area, and there is no dispute that this area was accessible to, and from, other even more hazardous areas. There is also evidence that Leppek would be unsupervised at times while in Department 61, which had only two other employees who worked on moving machinery. (Mayne Dep. 44:22-45:1, ECF No. 27-10.)

The Court notes the following information that Ford had at its disposal at the time it made its decision that Leppek was a safety risk that Ford was unwilling to sustain: (1) the AGV incident with medical opinions stating it was likely the result of a seizure, confirmed by direct evidence from co-workers involved in the incident; (2) Leppek's significant history of seizures at work; (3) Leppek's medical history of lifelong, largely and increasingly uncontrolled epileptic seizures; (4) the restrictions

placed on Leppek of no work in hazardous areas and no access to hazardous areas based on the agreement of three doctors. The Court finds that Ford's decision to not return Leppek to work because of the dangers of his placement in that Plant was objectively reasonable.

The above discussion demonstrates that Leppek's medical and employment circumstances certainly meets the factors laid out in 29 C.F.R. 1630.2(r): (1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm. As demonstrated by the AGV incident, which followed several on-the-job seizures, the likelihood and severity of potential harm resulting from an epileptic episode was very high. The law does not require that Ford continue to run this risk.

The question in the direct threat analysis is whether a reasonable juror could find that Ford acted unreasonably in determining that Leppek was a direct threat to his safety or the safety of others. *Wurzel*, 482 F. App'x 1, 13. The Court finds that based on the objective medical and testimonial evidence, and the information available to Ford, no reasonable juror could find that Ford's decision was unreasonable.

Finally, to reiterate, with regard to whether Ford was required to accommodate Plaintiff by creating a new permanent position for Plaintiff in Department 61, which Ford reasonably determined did not fit within his restrictions,

the Court notes the Sixth Circuit decision in *Smith v. Ameritech*, supports Ford's decision to not create a new permanent position:

> Our inquiry, therefore, is limited to whether plaintiff was "otherwise qualified" for his position, and whether he was denied reasonable accommodations … The ADA does not require employers to create a new position for a disabled employee who can no longer perform the essential functions of his job … Similarly, the ADA does not require an employer to reassign an employee to a position that is not vacant.

129 F.2d at 866-67.

## V.    Conclusion

Taking the facts in the light most favorable to Plaintiff, the non-moving party, Plaintiff Leppek has not shown that he is an "otherwise qualified individual" who has requested and been denied reasonable accommodation. Here, given his significant medical restrictions/limitations, Leppek had the burden to identify a vacant permanent employment position in which he could be placed. Because Leppek failed to show that there was a vacant position in Department 61, and because the evidence shows that Leppek's previous assignment to Department 61 was itself a temporary medical placement and accommodation because of his multiple incidents and necessary restrictions, Ford is entitled to summary judgment.

Even if this Court had determined that Leppek had proposed a reasonable accommodation, Ford has satisfied its burden of showing that its decision to not return Leppek to work because of the dangers to himself and others as a result of his

disability, was based on a reasonable interpretation of medical and direct employee-witnessed evidence.

Accordingly, Defendant Ford's Motion for Summary Judgment (ECF No. 27) is GRANTED.

SO ORDERED.


s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: April 30, 2021